1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

ADRIAN A. SAMPSON,                                    Case No. 2:20-cv-02223-KJD-DJA

                                    Plaintiff,          ORDER

        v.

KONICA MINOLTA BUSINESS SOLUTIONS
U.S.A. INC.,

                                    Defendant.

Presently before the Court is Defendant's Motion for Summary Judgment (#24). Plaintiff responded in opposition (#31) to which Defendant replied (#40).

I.      Factual and Procedural Background

Plaintiff Adrian A. Sampson ("Sampson") became employed by Defendant Konica Minolta Business Solutions ("KMBS") in October 2017. (#25-1, at 59). He was hired by then-Branch Manager, Tom Reed ("Reed"). Id. Sampson was hired to fill the position of Named Account Executive ("NAE"). Id. Sampson was responsible for generating new business and serving existing customers. He had an annual sales quota of $420,000.00. Id. at 19.

There were seven sales representatives in the Las Vegas office. (#40-2, at 5). There are various tiers of account executives, with NAE being the lowest. (#25-1, at 16). Above the NAEs are Senior Account Executives ("SAE") and above SAEs are Major Account Executives ("MAE"). Id. To be promoted up the chain, sales representatives must meet their quotas. Id. at 77. NAEs have a lower salary, lower quota, but more accounts to call on, which are typically smaller accounts than SAE's. Id. at 62.

When Sampson was hired, he and other Las Vegas sales representatives had a "vertical," meaning that they were assigned accounts in particular industries throughout the Las Vegas

Valley, as opposed to particular geographical territories. Id. at 18. Sampson was assigned the legal industry, so he "had all the law firms in Las Vegas to call on[.]" Id. Sampson felt his vertical did not yield fertile enough business because "law firms weren't very strong accounts" and did not "produce high-volume sales." Id. at 25. Sampson asked the Branch Manager, Tom Reed, to give him another vertical, but Tom refused. Id.

However, in August 2019, the company decided that most NAEs, including Sampson, would go from "verticals" to zip code-based territories. Id. at 78-79. Reed assigned the zip codes to particular people based on giving sales representatives a concentrated geographical area to reduce traveling times and increase efficiency. (#33, at 50-51). Sampson retained the downtown Las Vegas territory where many law offices are located because it was a concentrated area that included the legal industry. (#25-1, at 79). He retained 118 of the 128 law firms he had when he was working in a vertical industry. Id. at 124. Other employees had similar situations. For example, Robert Bloeker ("Bloeker") had vertical accounts, and after the general reassignment, he kept some vertical accounts and had a zip-code territory for general line productions. (#35, at 114).

Following the change from vertical to zip codes, Sampson's accounts increased a substantial amount. Id. at 82. Other KMBS employees were negatively impacted by the change from vertical to zip code as their accounts dropped. Id. at 84.

There were three SAE's, four NAEs, and one MAE at that time. (#35, at 92). Sampson and Andrew Deplessis ("Deplessis") were both NAEs and both African American. Zip code territories were assigned an average three-year revenue. Id. The average is the amount of revenue received from each account for a three-year period. (#40-2, at 2). These are different from the annual sales quota assigned to each sales representative. Id. Sampson was assigned the second-lowest average three-year revenue territory at $222,579.00. (#35, at 92). Duplessis was assigned the territory with the lowest average three-year revenue at $213,584.00. Id. The other sales representatives, who were not African American, were assigned territories with higher averages. Id.

On September 26, 2019, Sampson made an official complaint of race discrimination to

KMBS. (#25-1, at 107-12). The complaint went to Laura Stockbauer ("Stockbauer"), Senior HR

Business Partner, who provided Human Resources support for KMBS' West Region, including

Las Vegas. Id. at 116. Sampson informed Stockbauer that if there was no investigation, he would

file a claim with the EEOC. Id. at 107. Stockbauer responded to the complaint by interviewing

Sampson, Reed, Dean, and Karla Polanco ("Polanco"). (#25-1, at 118). The investigation ended

early because Sampson alleged that Stockbauer was biased against him. Id. at 119.

On October 17, 2019, KMBS retained an outside investigator, Ann Fromholz ("Fromholz"),

to investigate Sampson's complaint. Id. at 153. Fromholz submitted her "Report of Investigation:

Adrian Sampson's Complaints of Discrimination and Retaliation" on December 8, 2019. Id. at

123-50. That report included factual findings, a credibility assessment, assessed numerous

documents provided to her by KMBS and Sampson, and detailed in-person interviews with

different employees, including Sampson. Id. at 123.

The report found that the allegation that Sampson had accounts that should have been

assigned to him and others that were assigned to him were taken away was "not sustained by a

preponderance of the evidence." Id. at 130.

Fromholz concluded that "Sampson is not a credible witness" and noted that he was evasive

at times during the interview, that his account was "not inherently plausible and was at times

inconsistent." Id. at 149. She also stated that his account was contradicted by other witnesses and

relevant documents, and that "his perception of discrimination likely is not entirely accurate." Id.

On March 21, 2019, Sampson was issued a Letter of Warning. Id. at 94-95. The letter stated

that:

> On 12/3/18 we spoke about your performance and you received a
> Letter of Concern (LOC) with specific activities and goals you were
> to meet. To date, you have failed to consistently meet those
> requirements. You are currently at 40% of your established annual
> quota as a Named Account Executive having sold $167,552.00
> against an annual quota of $420,000.00 Your On-Target
> Achievement for the first 11 months of FY17 is 43.5%.... This
> documented performance is unacceptable and must be addressed
> immediately. You have not been meeting the expectations laid out
> in the Business Plan you presented on 12/14/18 and your
> performance has not improved.

Id. at 94. On July 17, 2019, Sampson was issued a Final Letter of Warning which stated that

he was "currently at 7.8% of your established annual quota as a Named Account Executive having sold $32,633.00 against an annual quota of $420,000.00."[1] Id. at 97. It stated that "[f]ailure to meet your job requirements or to adhere to company policies may result in further disciplinary action, up to and including termination of employment." Id. at 98.

Sampson was not the only account executive who received discipline from Reed for poor sales. One other NAE, and a SAE, both Caucasians, were given Final Letters of Warnings after both receiving an initial Letter of Concern and Letter of Warning. (#26, at 5-9). Reed had a financial incentive for Sampson and all NAEs to perform well because when NAEs performed well, it enhanced Reed's personal quota. (#25-1, at 70-71).

By November 2019, Sampson was put under surveillance by a private investigator to determine what Sampson was doing during work hours because the upper management was not convinced he was working when he said he was. Id. at 82. He was surveilled for two days: November 21-22. Id. On the first day, he arrived at the office at 7:54 A.M. and left for his house at 9:15 A.M. Id. at 183. He was not surveilled from 2:25 to 3:35 P.M. Id. He returned to the office around 4:30 P.M. and left again at 4:45 P.M. Id. The next day he arrived at the office at 7:54 A.M. and left at 8:26 A.M. Id. He met his wife downtown, and he returned to his house around 12:45 P.M. before returning to the office at 4:07 P.M. and left again a few minutes later. Id. Sampson was at his wife's naturalization ceremony from approximately 9:45-12:45 P.M. Id. at 8.

On November 25, 2019, Sampson was put on suspension pending investigation for falsifying activity reports into CMR. Id. at 196. CMR was the company database used for keeping track of KMBS's customers and prospective clients. Id. at 101. KMBS' protocol was to have sales representatives input all their activities into CMR, such as phone calls and appointments. Id. CRM keeps a log by employee ID of who enters and modifies any activity. Id. at 102. Reed had access to each employee's account in the CMR, as well as Sampson's employee ID and password. (#33, at 62). On November 22, 2019, Sampson made two entries in the CRM indicating that he had an 11:00 A.M. and 2:30 P.M. appointment on that same day. (#26, at 20-

[1] The Letter of Warning was regarding Fiscal Year 2017. The Final Letter of Warning was regarding Fiscal Year 2018.

1   26, #40-2, at 2). These entries were inconsistent with the reports of his surveillance and his

2   testimony that he was at his wife's naturalization ceremony. (#25-1 at 8).

3       Sampson received a copy of his surveillance report and a notice of his suspension and was

4   given the opportunity to refute the claim that he input false information about those

5   appointments. Id. at 200-01. Sampson claimed that he did in fact have those meetings and that

6   Reed knew that he did. Id. at 203-10. Sampson alleges that upper management fabricated the

7   entries as an attempt to frame him and terminate him. (#32, at 62). Another employee had

8   entered false information in the CMR, and that lead to an investigation into that employee, who

9   was later terminated. (#25-1, at 66). That particular employee was not surveilled by a private

10   investigator. (#34, at 6).

11       Following the investigation, on December 10, 2019, Sampson was terminated. (#25-1, at

12   198). The termination letter stated that the information entered into CMR did not match the

13   surveillance reports and that he had "documented poor sales performance[.]" Id. It stated that as

14   "a result of your repeated misconduct, your employment is being terminated effective, December

15   10, 2019." Id. Sampson was the first employee in the Las Vegas office to have been terminated

16   for allegedly inputting false information into CMR. (#33, at 28).

17       Sampson brings four claims against KMBS: two Title VII claims under 42 U.S.C. § 2000 for

18   (1) discrimination based on race; and (2) retaliation; and two Civil Rights Act of 1866 pursuant

19   to 42 U.S.C. § 1981 for (3) discrimination based on race; and (4) retaliation.

20       II.    Legal Standard for Summary Judgment

21       Summary judgment may be granted if the pleadings, depositions, answers to interrogatories,

22   and admissions on file, together with affidavits, if any, show that there is no genuine issue as to

23   any material fact and that the moving party is entitled to a judgment as a matter of law. See FED.

24   R. CIV. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party

25   bears the initial burden of showing the absence of a genuine issue of material fact. See Celotex,

26   477 U.S. at 323. The burden then shifts to the nonmoving party to set forth specific facts

27   demonstrating a genuine factual issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio

28   Corp., 475 U.S. 574, 587 (1986).

1  All justifiable inferences must be viewed in the light most favorable to the nonmoving party.

2  See Matsushita, 475 U.S. at 587. However, the nonmoving party may not rest upon the mere

3  allegations or denials of his or her pleadings, but he or she must produce specific facts, by

4  affidavit or other evidentiary materials as provided by Rule 56(e), showing there is a genuine

5  issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). "[T]here is a

6  preliminary question for the judge, not whether there is literally no evidence, but whether there is

7  any upon which a jury could properly proceed to find a verdict for the party producing it[.]" Id.

8  at 251. "Where evidence is genuinely disputed on a particular issue—such as by conflicting

9  testimony—that 'issue is inappropriate for resolution on summary judgment.'" Zetwick v. Cnty.

10  of Yolo, 850 F.3d 436, 441 (9th Cir. 2017) (quoting Direct Techs., LLC v. Elec. Arts, Inc., 836

11  F.3d 1059, 1067 (9th Cir. 2016)).

12      III.    <u>Analysis</u>

13      Title VII prohibits employers from discriminating against an individual because of race. See

14  Bostock v. Clayton Cty., Georgia, 140 S.Ct. 1731, 1739 (2020). This entails but-for causation,

15  meaning the adverse employment action would not have happened "but for" the individual's

16  race. Id.

17      § 1981 provides that,

18  
19  
20  
21  

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the fully and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

22  
23  42 U.S.C.A. § 1981.

24      The Supreme Court of the United States has recently held that a "§ 1981 plaintiff bears the

25  burden of showing that the plaintiff's race was a but-for cause of its injury, and that burden

26  remains constant over the life of the lawsuit." Comcast Corp. v. Nat'l Assoc. of African

27  American-Owned Media, 140 S. Ct. 1009, 1011 (2020). "To prevail, a plaintiff must initially

28  plead and ultimately prove that, but for race, it would not have suffered the loss of a legally

protected right." Id. at 1019.

The McDonnell Douglas burden shifting framework applies to Title VII and § 1981 cases. See Surrell v. California, 518 F.3d 1097, 1103 (9th Cir. 2008). The McDonnell Douglas framework requires a plaintiff to make a prima facie case of discrimination, and then the burden shifts to defendant to produce evidence of a legitimate nondiscriminatory reason for the challenged action. St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1992). If the defendant meets this burden of production, any presumption that the defendant discriminated "drops from the case." Id. at 507. At this point, the plaintiff must be given the opportunity to demonstrate that the proffered reason or reasons were pretext for intentional discrimination. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255-56 (1981).

**A.  Racial Discrimination under Title VII and 42 U.S.C. § 1981: Counts I and III.**

If an employee can establish a prima facie case of discrimination, the employer must articulate a legitimate, nondiscriminatory reason for the employment decision, and if it does so, the burden shifts back to the employee to prove that the employer's explanation was pretextual. See France v. Johnson, 795 F.3d 1170, 1173 (9th Cir. 2015).

"The requisite degree of proof necessary to establish a prima facie case for Title VII… on summary judgment is minimal and does not even need to rise to the level of preponderance of the evidence." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994). "The plaintiff need only offer evidence 'which gives rise to an inference of unlawful discrimination.'" Id., quoting Yartzoff v. Thomas, 809 F.2d 1371, 1375 (9th Cir. 1987). To establish a prima facie case, Sampson must show (1) he belonged to a protected class; (2) he was qualified for his job; (3) he was subjected to an adverse employment action; and (4) similarly situated employees not in his protected class received more favorable treatment. See Moran v. Selig, 447 F.3d 748, 753 (9th Cir. 2006).

*i.    Denial of a promotion and disparate performance standards*

Federal Rule of Civil Procedure 56(e)(2) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion." KMBS argued that even looking at the facts in a light most favorable to Plaintiff no genuine issue of fact

1    prevented the Court from granting its motion for summary judgment on the Title VII and § 1981

2    claims based on the alleged denial of a promotion and the disparate treatment claim based on

3    differing performance standards. (#24, at 13-14). Sampson did not address either in his

4    opposition. (#31). The principle purpose of the summary judgment procedure is to isolate and

5    dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 323-24. The moving

6    party bears the initial burden of presenting the basis for its motion and identifying the portions of

7    the record or affidavits that demonstrate the absence of a genuine issue of material fact. Id. at

8    323. When the plaintiff bears the burden of proof at trial "it must come forward with evidence

9    [that] would entitle it to a directed verdict if the evidence went uncontroverted at trial." C.A.R.

10   Transp. Brokerage Co. v.  Darden Restaurants, Inc., 213 F.3d 474, 480 (9th Cir. 2000). The

11   Court is not tasked with sifting through the many exhibits to find Sampson's hypothetical

12   arguments addressing these two issues. Sampson has failed to meet his burden in raising specific

13   issues of fact regarding these claims. Thus, summary judgment is granted to KMBS on the issues

14   of the promotion and performance standards.

15        *ii.        Change from vertical to zip codes*

16        Sampson has not met his burden of proving a prima facie case of employment discrimination.

17   Sampson alleges that the adverse employment action, or as he argues, the disparate treatment,

18   occurred when Reed made the change from vertical accounts to zip code territories. (#31, 23-26).

19   An adverse employment action for purposes of a disparate treatment claim must materially affect

20   the terms and conditions of employment. See Thompson v. North American Stainless, LP, 562

21   U.S. 170, 174 (2011). He argues that it negatively affected only him and the other African

22   American sales representative because it lowered their three-year average zones. (#31, 23-26).

23        However, "to show that 'employees' allegedly receiving more favorable treatment are

24   similarly situated (the fourth element necessary to establish a prima facie case under Title VII),

25   the individuals seeking relief must demonstrate, at the least, that they are similarly situated in all

26   material respects." Moran, 447 F.3d, at 755. Here, four of the employees with higher three-year

27   averages were SAE's or MAE's, so they are not appropriate for comparison. NAEs have

28   different sales metrics than the SAE's and MAE's so the averages are not comparable.

It is also undisputed that the change from vertical to zip codes increased his accounts substantially. (#25-1, at 124). Gaining accounts after the change cannot amount to an adverse employment action. Therefore, summary judgment on the issue of changing from vertical to zip codes is granted for KMBS.

### iii.    *Losing vertical accounts*

Sampson also alleges that KMBS took away some of his vertical accounts. (#1, at 5). He alleges this happened to him because of his race. (#25-1, at 131). The burden to establish a prima facie case is minimal and viewing all justifiable inferences in light most favorable to Sampson, the Court finds Sampson has made out a prima facie case.

However, KMBS has legitimate explanations for what occurred with the various accounts to which Sampson refers. Fromholz's report details KMBS's policies and what happened with those accounts. Id. at 131-36.

Sampson must raise a genuine issue of material fact that the legitimate nondiscriminatory reason for the challenged action is a mere pretext for actual discrimination. Sampson can "demonstrate pretext in either of two ways: (1) directly, by showing that unlawful discrimination more likely than not motivated the employer; or (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable." Braaten v. Newmont USA Ltd., 3:15-cv-00174-LRH-WGC, 2017 WL 555983, at *5 (D. Nev. Feb. 10, 2017). Evidence supporting a pretextual argument must "be both specific and substantial to overcome the legitimate reasons put forth" by the employer. Aragon v. Republic Silver State Disposal Inc., 292 F.3d 654, 659 (9th Cir. 2002).

Sampson has not adduced any facts to demonstrate any direct or indirect evidence of pretext. (#31, at 25-26). He has not provided any evidence that KMBS was more likely than not taking away accounts based on race, or that KMBS's explanation regarding its policies and mistakes are inconsistent or not believable. Therefore, summary judgment on the issue of losing accounts is granted to KMBS.

**B.  Retaliation under Title VII and 42 U.S.C. § 1981: Counts II and IV.**

Section 1981 does not contain a specific statutory provision prohibiting retaliation, but the

1    Supreme Court has held that retaliation claims are cognizable under § 1983. See CBOCS West,

2    Inc. v. Humphries, 553 U.S. 442, 446 (2008). Retaliation claims under Title VII & § 1981 are

3    analyzed under the same legal framework. See Surrell, 518 F.3d, at 1103.

4        "Title VII retaliation claims must be proved according to traditional principles of but-for

5    causation…" which "[r]equires proof that the unlawful retaliation would not have occurred in the

6    absence of the alleged wrongful action or actions of the employer." Univ. of Texas Sw. Med Ctr.

7    v. Nassar, 570 U.S. 338, 360 (2013). "To establish a prima facie case of retaliation, a plaintiff

8    must prove (1) she engaged in a protected activity; (2) she suffered an adverse employment

9    action; and (3) there was a causal connection between the two." Surrell, 518 F.3d at 1108.

10       Sampson alleges that his protected activity was the likely reason for his termination. (#31, at

11   26). Sampson did engage in various activities protected by Title VII and § 1981, like filing a

12   complaint with KMBS' HR department. He did suffer an adverse employment action when he

13   was terminated, and there is enough evidence to satisfy the low burden for making out a prima

14   facie case that there was a causal link between his complaints and his termination.

15       KMBS has asserted a legitimate and nondiscriminatory reason for terminating Sampson.

16   Sampson was issued a letter of concern, a letter of warning, and a final letter of warning. He was

17   not meeting his sales quota. He was suspected of not working during regular work hours and

18   surveillance of him confirmed that. He was also caught entering false information into CMR.

19       There is also no genuine dispute that false entries were made into CMR regarding Sampson's

20   activities. The entries at issue were from November 22, 2019, relating to alleged in-person

21   meetings that day with DynaElectric, Altitude Color Technologies, and Peopleskills. Polanco,

22   the director of sales planning, confirmed that those entries were made on November 22 between

23   2:37 P.M. and 3:24 P.M. with Sampson's ID number. Sampson does not dispute that he did not

24   have any in-person meetings with those clients on November 21-22, 2019 and agrees that those

25   entries are false. However, he asserts that he did not make the entries. Sampson alleges that Reed

26   used Sampson's identification number to make the false entries– a conspiratorial act intended to

27   justify Sampson's termination (#31, at 13-15).

28       Summary judgment cannot be defeated with conclusory allegations; there must be disputed

1  evidence based on material facts. That disputed evidence must be of the type "upon which a jury

2  could properly proceed to find a verdict for the party producing it." <u>Anderson</u>, 477 U.S. at 250-

3  51. Sampson has not provided evidence to meet this standard, he has only accused the managers

4  of putting in false information to frame him.

5       Sampson also argues that KMBS' reasons for firing him are merely pretextual. Sampson has

6  two avenues for showing that KMBS' legitimate explanation for firing him is actually a pretext

7  for retaliation. <u>See</u> <u>Stegall v. Citadel Broadcasting Co.</u>, 350 F.3d 1061, 1066 (9th Cir. 2003).

8  First, he can directly persuade the court that a discriminatory reason more likely motivated

9  KMBS, or second, show that KMBS's proffered explanation is unworthy of credence. <u>See</u> <u>id.</u>

10      Sampson has not presented any direct evidence that KMBS has a discriminatory motive.

11 KMBS fired him after an official complaint of racial animus was made, but that complaint was

12 investigated and deemed not credible, and Sampson was failing to meet his sales quota, and he

13 was entering false data into CMR about his work productivity that was directly contradicted by

14 surveillance of him. Another sales representative, a Caucasian male, was also terminated for

15 entering false information into CMR.

16      Sampson has also failed to present sufficient indirect evidence to demonstrate that these

17 reasons for termination are unworthy of credence. The Court holds that a reasonable factfinder

18 could not rationally find that these reasons are weak, implausible, inconsistent, incoherent, or

19 contradictory given all the evidence and undisputed facts. <u>See</u> <u>Morgan v. Hilti, Inc.</u>, 108 F.3d

20 1319, 1323 (10th Cir. 1997). Therefore, summary judgment is granted in favor of KMBS on

21 Sampson's retaliation claims.

22

23

24

25

26

27

28      //

III.     Conclusion

Accordingly, **IT IS HEREBY ORDERED** that Defendant KMBS's Motion for Summary

Judgment (#24) is **GRANTED;**

**IT IS FURTHER ORDERED** that the Clerk of the Court enter **JUDGMENT** for Defendant

KMBS and against Plaintiff.

DATED this 13th day of March 2023.

Kent J. Dawson
United States District Judge